UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Hiis Farah, Hiisi Abdi, Aden Fithar, Emily
Nyakundi, Dayvid Wekesah, Hassan
Mohamud, and Mukhtar Abubakar,

                Plaintiffs,

v.

Alpha & Omega USA, Inc., d/b/a
Travelon Transportation, and Viktor
Cernatinskij,

                Defendants.

Civ. No. 16-996 (PAM/DTS)

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment. For the following reasons, the Motion is denied.

**BACKGROUND**

Defendant Viktor Cernatinskij ("Viktor")[1] is the majority owner and CEO of Defendant Alpha & Omega USA, Inc., d/b/a Travelon Transportation ("Travelon"). (Viktor Aff. ¶ 1.) For more than 20 years, Travelon has provided "special transportation service" in Minnesota. (Id. ¶ 2.) State law defines "special transportation service" as "motor vehicle transportation provided on a regular basis by a public or private entity . . . that is designed exclusively or primarily to serve individuals who are elderly or disabled and who are unable to use regular means of transportation but do not require ambulance service." Minn. Stat. § 174.29, subd. 1. "Special transportation service" includes specially equipped buses, vans, and taxis. Id.

---

[1] Due to the similarity between Cernatinskij's surname and that of another key witness (Maria Cernatinschi), the Court refers to these individuals by their first names.

Plaintiffs Hiis Farah, Hirsi Abdi, Aden Fithar, Emily Nyakundi, David Wekesah, Hassan Mohamud, and Mukhtar Abubakar (collectively, "Plaintiffs") formerly served as drivers for Travelon.[2] When hired, each signed an "Independent Contractor Agreement" purporting to deem him or her an independent contractor, not an employee. (See, e.g., Docket No. 51-1.) The agreement specified that Travelon would pay the driver a "commission" equal to 100% of the amount paid by a customer (or his or her insurance) for transportation services. (Id.) The driver, in turn, agreed to pay Travelon a $400 "weekly dispatch payment," plus 40% of all commissions earned over $2,100, in exchange for Travelon's "dispatch services." (Id.) Travelon leased each driver a vehicle and equipment to use in connection with the transportation services, for which the driver agreed to pay certain additional fees. (Id.)

When they first agreed to work for Travelon, Plaintiffs were informed they could choose the dates and times they wanted to work. (See, e.g., Abdi Aff. ¶ 25.) In reality, however, Travelon did not ask about their preferred working times and dispatched them (using an electronic application called "Driver Mate") to pick up or drop off customers on a rolling basis throughout each day, from early in the morning until late in the evening, including on weekends. (E.g., id. ¶¶ 17-18, 20-21.) Typically there were no pauses between the trips to which Plaintiffs were dispatched. (E.g., Nyakundi Aff. ¶ 24; see also Blades Decl. Ex. 67-73.) They were afforded no control over their schedules and were required to obtain permission from Maria, the dispatcher, before taking breaks, ending

---

[2] The Complaint incorrectly spells Abdi's and Wekesah's first names. (Abdi Aff. ¶ 2; Wekesah Aff. ¶ 2.)

their days early, or taking time off. (See, e.g., Mohamud Aff. ¶ 16; Farah Aff. ¶ 20; Blades Decl. Ex. 31 ("If you need to be off, take breaks, log off early, etc., please make sure to COORDINATE everything with the dispatcher. The dispatcher will check to make sure it is possible to cover your trips without you and will grant you permission. If the dispatcher cannot cover your trips you will not be granted permission.") (emphasis in original).) Plaintiffs believed that their employment would be terminated if they refused to take trips or went on breaks. (See, e.g., Abubakar Aff. ¶ 23.)

Each day, Plaintiffs tracked the customers they transported using "trip logs." (Viktor Aff. ¶ 4; Blades Decl. Exs. 67-73.) Both Minnesota and insurance companies required these logs to document the trips and allow Travelon to be paid for them. (Viktor Aff. ¶ 5.) The logs indicated the time a Plaintiff began driving for the day and the time the last customer was dropped off, along with all trips handled in between; the mileage traveled; the customers' names; and the addresses of each customer's embarkation and disembarkation points. (See, e.g., Blades Decl. Ex. 67.) Plaintiffs submitted the logs to Defendants on a weekly basis. (Viktor Aff. ¶ 4.)

Only rarely did customers directly pay Plaintiffs. (See, e.g., Abubakar Aff. ¶ 24.) Instead, Travelon billed either the customers' insurance or the state, if the customer received government assistance, for the transportation services. Travelon then paid Plaintiffs, after withholding its various fees. (Id. ¶ 25.) Plaintiffs were not consulted about the amounts they were paid, which often did not make sense to them. When questioned about it, Viktor did not take Plaintiffs' questions seriously. (Id. ¶¶ 24-25;

Abdi Aff. ¶¶ 26-29.) At times, Plaintiffs went weeks without receiving any money from Travelon. (Abubakar Aff. ¶ 26; Abdi Aff. ¶ 28.)

Plaintiffs commenced this action in the Hennepin County District Court in March 2016. Defendants removed the action to this Court, and Plaintiffs then filed an Amended Complaint asserting five claims against Travelon and Viktor: failure to pay overtime and minimum wage, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. (Count I); failure to pay overtime and minimum wage, failure to provide rest and meal breaks, and making unauthorized pay deductions, in violation of the Minnesota Fair Labor Standards Act ("MFLSA"), Minn. Stat. § 177.21 et seq. (Count II); unlawful pay deductions and failure to provide a statement of the hours Plaintiffs worked, in violation of the Minnesota Payment of Wages Act, Minn. Stat. § 181.01 et seq. (Counts III and IV); and, in the alternative, breach of the Independent Contractor Agreements (Count V). In June 2016, the Court stayed the breach-of-contract claim, pending resolution of the remaining claims. (Docket No. 22.) Defendants now move for summary judgment on each of those claims.[3]

## DISCUSSION

The crux of this case is whether Plaintiffs were Defendants' employees, rather than independent contractors. Indeed, both sides acknowledged at oral argument that this case "lives or dies" on the employee/independent-contractor distinction, because absent an employment relationship, none of Plaintiffs' statutory claims is viable. But

---

[3] Defendants do not argue that Viktor's potential liability somehow differs from that of Travelon. Accordingly, the Court addresses them together.

Defendants do not argue that each Plaintiff was, in fact, an independent contractor, choosing instead to reserve that issue for trial. (See Defs.' Reply Mem. at 1 ("Defendants contend that Plaintiffs were not their employees, but Defendants have chosen not to argue this essential element of Plaintiffs' claims in their motion for summary judgment.").) Because the independent contractor issue is dispositive of the case, the Court believes that it should be addressed before trial, if possible. Thus, the Court invites the parties to submit the issue in a subsequent motion.

Rather than arguing the dispositive independent-contractor issue, Defendants Defendants argue that even if Plaintiffs were their employees, they are still entitled to summary judgment. The Court does not agree.

## I. Knowledge

Defendants' primary argument concerns Plaintiffs' claims for unpaid overtime. They argue that Plaintiffs have failed to point to evidence in the record demonstrating they were aware Plaintiffs were working overtime hours. They deny knowing the actual hours Plaintiffs worked, because Plaintiffs were paid by the job and thus "the number of hours a particular Plaintiff worked during a particular workday or a particular workweek was of no relevance." (Viktor Aff. ¶ 3.) And, they contend that no Plaintiff ever alerted them that he or she worked more than 40 hours in a particular week. (Id.) Without knowledge that Plaintiffs were working overtime, Defendants argue that they cannot be liable. See, e.g., Hertz v. Woodbury Cty., 566 F.3d 775, 781 (8th Cir. 2009) ("[I]n order to prevail on their overtime claims, Plaintiffs were required to present evidence that they

5

worked above their scheduled hours without compensation and that the [defendant] knew or should have known that they were working overtime.").

Plaintiffs respond that Defendants had constructive knowledge they were working overtime, based on the trip logs.[4] As the Eighth Circuit has noted, "constructive knowledge of overtime work is sufficient to establish liability under the FLSA, if [Defendants], through reasonable diligence, should have acquired knowledge that Plaintiffs were working in excess of their scheduled hours." Id. The parties' dispute, then, is whether the evidence in the record is sufficient to create a jury issue on constructive knowledge. Defendants correctly note that the appropriate standard is not whether they could have determined Plaintiffs were working overtime, but rather whether they should have done so. See id. The evidence in the record here is sufficient for a jury to find that Defendants should have known Plaintiffs were working excessive hours.

It is undisputed that Plaintiffs submitted trip logs to Defendants every week. Those logs documented the time each Plaintiff began working on a given day and stopped working in the evening, easily providing the information from which Plaintiffs' working hours could be determined. Defendants argue that the logs "did not afford [them] the opportunity to acquire knowledge of overtime hours" because they indicated only the pick-up and drop-off times for each trip, and the gaps between trips "cannot be counted as hours worked." (Defs.' Reply Mem. (Docket No. 49) at 4.) But there are two problems with this argument. First, evidence in the record suggests the pauses were not

---

[4] Plaintiffs also argue Defendants had actual knowledge they were working overtime, but the Court need not reach that issue.

off-the-clock time for Plaintiffs, but rather were spent traveling to the next job. (See, e.g., Nyakundi Aff. ¶ 24 ("[T]here was never a pause in the trips that were dispatched to me."); see also Mohamud Aff. ¶ 22 (asserting that Viktor "told me that I could not take breaks").) Moreover, the logs reflect that the time between trips often was very short. (See, e.g., Blades Decl. Ex. 70 (reflecting gap between drop-off and subsequent pick-up sometimes was as little as five minutes).) Under federal regulations, time spent not working is still considered on-duty unless it is "long enough to enable [the employee] to use the time effectively for his own purposes." 29 C.F.R. § 785.16(a). Indeed, the regulations recognize that "[r]est periods of short duration, running from 5 minutes to about 20 minutes, are common in industry" and "promote the efficiency of the employee," and therefore "must be counted as hours worked." Id. § 785.18. Second, even if Plaintiffs were not actually transporting customers or traveling to the next pick-up during their "down time," Defendants recognize that the gaps still might be construed as time "engaged to wait," which is compensable under Department of Labor regulations. (See Defs.' Reply Mem. at 5 (citing 29 C.F.R. § 785.14-.16).)

Regardless, the trip logs paint only part of the picture here. Beyond the logs, evidence reveals that Defendants established each Plaintiff's daily work schedule and the trips to which he or she was dispatched. See, e.g., Schmidt v. DIRECTV, LLC, Civ. No. 14-3000, 2017 WL 3575849, at *5 (D. Minn. Aug. 17, 2017) (Tunheim, C.J.) (denying summary judgment on overtime claims where record contained evidence that defendants "kept records of Plaintiffs' work schedule and tracked Plaintiffs' job status"). Evidence also shows that Plaintiffs were required to obtain permission before taking a day off,

7

going on break, or turning down a trip. And Viktor encouraged Plaintiffs to work long hours to maximize their income (and, presumably, his own), in one instance telling Mohamud "not to lose any trips" "from 4-5 am to 7-8 pm." (Blades Decl. Ex. 53.) See Brennan v. Qwest Commcn's Int'l, Inc., 727 F. Supp. 2d 751, 758 (D. Minn. 2010) (Montgomery, J.) (denying summary judgment where the defendant "assigned a daily work load" that by its own estimates "would require" overtime work). A reasonable jury could conclude from this evidence that Defendants should have been aware that Plaintiffs were working overtime.

Relying heavily on Hertz, 566 F.3d 775, Defendants argue that the trip logs are insufficient to establish that they should have known that Plaintiffs were working excessive hours. As already noted, there is more evidence in the record than just the trip logs. And Hertz does not support Defendants' arguments in any event. In Hertz, several police officers employed the county sheriff's department for unpaid overtime. Id. at 777. The officers used the county's computerized system ("CAD") to indicate when they were available to engage in law-enforcement activities. Id. at 779. However, the county tracked each employee's working hours using a sign-in sheet, and it established a system for overtime pay requiring the submission of a paper slip and supervisor approval. Id. The plaintiffs argued that the CAD system should have alerted the county that they were working overtime, but the Eighth Circuit disagreed, noting the CAD was not used for payroll purposes, but rather "only . . . so that dispatchers know what officers are available to respond to an emergency." Id. at 782. Access to CAD records, therefore, was "not necessarily sufficient to establish constructive knowledge." Id. at 781; see also id. at 782

("It would not be reasonable to require that the County weed through non-payroll CAD records to determine whether or not its employees were working beyond their scheduled hours. This is particularly true given the fact that the County has an established procedure for overtime claims that Plaintiffs regularly used.").

Here, by contrast, the trip logs were the very records used to document the work Plaintiffs performed and which formed the basis for their compensation. Furthermore, unlike the county in Hertz, Defendants here established no system for the payment of overtime. This is hardly a surprise, as Defendants contend that Plaintiffs were independent contractors and their working hours were irrelevant. (Viktor Aff. ¶ 3.) Hertz was expressly limited to its facts, and the Eighth Circuit refused to "foreclose the possibility that another case may lend itself to a finding that access to records would provide constructive knowledge of unpaid overtime work." 566 F.3d at 782. Given the record before the Court, that is true here.

## II. Damages

Defendants next take issue with Plaintiffs' alleged damages. They argue that Plaintiffs are required to adduce "substantial evidence" sufficient to "permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages" they sustained due to the allegedly unpaid overtime, but they have failed to do so. (Defs.' Supp. Mem. at 12-13.) But Defendants acknowledge that they did not maintain records documenting the hours worked by Plaintiffs, other than the trip logs. (See Blades Decl. Ex. 66 at 2.) Where "an employer has failed to keep records, employees are not denied recovery under the FLSA simply because they cannot provide

9

the precise extent of their uncompensated work." Holaway v. Stratasys, Inc., 771 F.3d 1057, 1059 (8th Cir. 2014). Instead, they receive compensation "based on the most accurate basis possible." Id. Otherwise, employers would be rewarded for their failure to maintain records required by law. See 29 U.S.C. § 211(c).

Here, Plaintiffs point to the trip logs—the only documents Defendants maintained—as evidence of their overtime. Defendants respond by recycling their argument that the logs do not suffice (see Defs.' Reply Mem. at 10-11), but for the reasons discussed above, the Court concludes that the logs, combined with the other evidence in the record, are sufficient for a jury to determine the number of hours each Plaintiff worked in a particular week. This provides an adequate basis to determine the allegedly unpaid overtime.

Defendants next argue that Plaintiffs have erred in their calculation of damages. For employees such as Plaintiffs who were not paid a set hourly wage, a "regular rate" of pay is calculated by taking the employee's total remuneration in a particular week and dividing it by the number of hours worked in that week. 29 C.F.R. § 778.109. So, for example, a driver who earned commissions totaling $3,000 in a week in which he worked 60 hours would have a "regular rate" of pay for that week of $50 per hour, which is then used to determine the appropriate amount of overtime pay. Id. Because this is a week-by-week calculation, an employee's regular rate and overtime rate may differ for each week he or she worked. See id. § 778.114(b).

Defendants argue that Plaintiffs erred by failing to allot their commission payments to the particular weeks in which they were earned, and then compounded that

10

error by failing to divide the total commissions earned in a given week by the number of hours actually worked in that week. Instead, Plaintiffs calculated their regular rates of pay by dividing the total compensation they received over their entire employment by the total number of weeks worked for Defendants, and then dividing that number by 40. (See Minenko Decl. Ex. A at 29.) Defendants believe this error means "overtime compensation cannot be awarded" and they are entitled to dismissal of the overtime claims. (Defs.' Supp. Mem. at 17.)

Defendants may well be correct that Plaintiffs erred in their calculations; indeed, Plaintiffs appear to recognize that their methodology was improper. (See Pls.' Opp'n Mem. (Docket No. 46) at 28-29.) Nevertheless, even if Plaintiffs erred, Defendants are not entitled to summary judgment. At most, Plaintiffs have overstated their damages by failing to accurately calculate their regular rates of pay and the overtime compensation they are allegedly due. Assume, for instance, that in a week Plaintiff Abdi worked 50 hours, he wrongly calculated his hourly rate as $20 instead of $16. Abdi would be entitled to overtime pay equal to 1-1/2 times his correct $16 hourly rate for the 10 hours he worked beyond 40 in that week—the overtime due would total $240, not $300. But this error simply diminishes the amount of his recovery; it does not mean he cannot recover at all. In other words, Defendants' argument challenges the extent of Plaintiffs' damages, not their existence. Defendants are not entitled to summary judgment on this basis.

Notably, Defendants do not make the argument that by failing to disclose a proper damages methodology, it is too late for Plaintiffs to do so now, and without proof of

11

damages, Plaintiffs' claims fail.  See Fed. R. Civ. P. 26(a)(1)(A)(iii) (requiring a plaintiff to disclose "a computation of each category of damages claimed"); Fed. R. Civ. P. 37(c) (generally prohibiting a party for using at trial evidence that it failed to disclose). Regardless, the underlying data on which Plaintiffs calculated their damages is clear; at most, Plaintiffs erred when performing basic arithmetic using that data.  Under these circumstances, any error is harmless and Plaintiffs would not be barred from remedying that error at trial.  See Fed. R. Civ. P. 37(c)(1) (barring evidence at trial "unless the failure [to disclose] is harmless").  This is particularly true when Defendants allegedly failed to maintain wage-and-hour records required by law.  See, e.g., Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 688 (1946) (noting that where an employee has performed work for which he was not properly paid, it would be "a perversion of fundamental principles of justice to deny all relief" due to some "uncertainty . . . in the amount of damages arising from the statutory violation by the employer") (quotation omitted), superseded by statute on other grounds, 29 U.S.C. § 254(a).[5]

## III.   Liquidated damages

Finally, Defendants argue that even if Plaintiffs can show an overtime or minimum-wage violation, they are not entitled to liquidated damages for that violation.

---

[5] Defendants raise a similar argument with respect to the minimum-wage claims and unlawful-deduction claims.  Defendants assert that Plaintiffs failed to allocate commissions to the particular weeks in which they were earned and thus failed to establish the hourly rate paid for each week they worked.  But Plaintiffs have proffered evidence indicating they often went weeks without receiving any pay, and at least Plaintiff Nyakundi asserts that she was never paid.  (See Blades Decl. Ex. 58 at 1-23.) And although Plaintiffs did not directly address Defendants' argument with respect to the claims for unlawful pay deductions, both of these arguments go only to the amount of Plaintiffs' damages.

The FLSA provides that a successful plaintiff may recover the unpaid wages due to him, as well as an equal amount as liquidated damages. 29 U.S.C. § 216(b). These liquidated damages are "mandatory unless the employer can show good faith and reasonable grounds for believing that it was not in violation of the FLSA." Jarrett v. ERC Props., Inc., 211 F.3d 1078, 1083 (8th Cir. 2000). However, Defendants conceded in their reply memorandum that a determination on good faith is premature. (Defs.' Reply Mem. at 12.) Accordingly, this portion of Defendants' Motion will be denied without prejudice. See also Longlois v. Stratasys, Inc., 88 F. Supp. 3d 1058, 1081 (D. Minn. 2015) (Ericksen, J.) (stating that, with FLSA liability "an open question for trial, this issue [] is not ripe for adjudication").

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED that** Defendants' Motion for Summary Judgment (Docket No. 38) is **DENIED**.

Date: November 27, 2017         *s/ Paul A. Magnuson*
                                Paul A. Magnuson
                                United States District Judge